UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**GEORGE IVES TAY,**

     **Petitioner,**

**v.**                         **Case No. 8:22-cv-63-MSS-TGW**

**SECRETARY, DEPARTMENT
OF CORRECTIONS,**

     **Respondent.**

_____/

## O R D E R

Tay petitions for a writ of habeas corpus under 28 U.S.C. § 2254 and challenges his state court convictions for possession of child pornography. (Doc. 1) Also, Tay moves for a ruling on his petition. (Doc. 20) After reviewing the petition, the response (Doc. 8), the reply (Doc. 13), Tay's supplemental brief (Doc. 17), the relevant state court record (Doc. 8-2), and Tay's supplemental brief (Doc. 17), the Court **DENIES** the petition. Tay's motion (Doc. 20) for a ruling is **DENIED** as moot.

## PROCEDURAL HISTORY

Tay pleaded guilty to one hundred counts of possessing child pornography. (Doc. 8-2 at 680–86) The trial court sentenced Tay to ten years in prison. (Doc. 8-2 at 687–91) Tay appealed, and the state appellate court affirmed. (Doc. 8-2 at 694) The post-conviction court denied relief (Doc. 8-2 at 836–39), and the state appellate court affirmed. (Doc. 8-2 at 884) Tay's federal petition follows.

At the change of plea hearing, trial counsel stipulated, for purposes of the plea, to the facts set forth in the arrest affidavit and agreed that those fact were sufficient to establish a

factual basis for the plea. (Doc. 8-2 at 767) The arrest affidavit summarized the facts that

supported the plea (Doc. 8-2 at 6–8):

> I Detective Paula Parker #298 received this case on 04/20/2017 about the suspect, George Tay, DOB: 06/15/1962, fifty-five years old, who downloaded images and videos of child pornography on a computer that was assigned to him at his place of business, BrightVolt (formally Solicore) located at 2700 Interstate Drive in Lakeland, Polk County, Florida.
>
> On 04/19/2017, Uniform Patrol Officer, Christopher Hoo #153, responded to BrightVolt, where he contacted the vice president of the company, John Davis. Hoo also contacted Brightvolt's Information Technology Manager, Ronnie Tartar.
>
> Per Hoo's report, Tartar explained, the corporation frequently backs up their computers on their networks to a server. During the backing [up] of all computers on 04/18/2017, one computer would not back up, and that computer was assigned to Mr. George Tay.
>
> Tartar advised, after further investigation on Tay's computer, he observed what appeared to be videos of child pornography, which is located throughout the hard drive.
>
> Tartar brought the information that he had found to the attention of Vice President John Davis. After receiving the information from Tartar, Davis planned to place Tay on administrative leave when G. Tay came back to work on 04/19/2017.
>
> Officer Hoo got the permission from [Vice President] Davis to have the company computer assigned to G. Tay forensically analyzed. [Vice President] Davis signed a consent to search the computer. The computer was placed into evidence by Hoo at LPD.
>
> On 04/19/2017, when G. Tay returned to work, he was released from his duties with BrightVolt. Per Hillsborough County Police reports, when he returned home, he left a note for his wife that read:
>
>> Mary Lu,
>>
>> I'm sorry. I have failed again. You are such a wonderful person, and I have failed you one more

time. I cannot begin to tell you how wonderful you are. For someone who['s] smart, I am so stupid. Tell the kids that I love them, and that I cannot be there for them anymore.

Call Cindy for help. Call the church if you need someone closer. That is another failure. I could not help you find any friends in the area.

Please tell the kids that I love them. Be there for them in a way I could not. Take the chance and leave Florida as soon as you can. The thought of you reading this is paralyzing.

I'm sorry.

Love,
George

Contact Theresa at BrightVolt for paycheck and insurance information. Sorry, I have little more. (863) 603-7640.

On 04/19/2017, after reading the letter left by her husband, Margaret Tay contacted the Hillsborough County Sheriff's Office. Per a report written by HCSO Deputy Basilone, she responded to Tay's home, which is located at 4510 Compass Oaks, Valrico, Florida, where she was given the note G. Tay left for his wife. Deputy Basilone filled out a missing/endangered person's affidavit at approximately 1855 hrs. HCSO report #2017-276554.

During HCSO's investigation, HCSO learned of G. Tay's employer BrightVolt and HCSO contacted BrightVolt and was advised that G. Tay was at work on 04/19/2017 from 0900 to l000 hrs. HCSO then learned G. Tay had been placed on administrative leave at work on 04/19/2017. HCSO learned that G. Tay was being investigated for possession of child pornography by the Lakeland Police Department.

On 4/19/2017, per HCSO report, deputies reviewed an online banking alert e-mail sent to Margaret Tay from Chase Bank sent at 1609 hrs. The alert notified M. Tay of a $140.00 charge from Patriot Arms located at 113 Brandon Blvd. E. Deputy Basilone called the store and learned G. Tay put a deposit of $140.00 down on a Mossberg 590 Shockwave shotgun. Deputies learned

G. Tay had been at the gun store on 04/19/2017 between 1600 and 1611 hrs.

During HCSO investigation into G. Tay's whereabouts, while at the Tay residence, G. Tay responded to an e-mail from his daughter. Deputies requested Margaret Tay, George's wife, attempt to correspond with G. Tay via her e-mail address. M. Tay was able to elicit responses from G. Tay in which he stated he was "ok." G. Tay refused to cooperate and give his location to M. Tay or allow[ ] her to meet with him.

Ultimately, Detective Steele with HCSO corresponded via e-mail and Detective Steele identified himself as a law enforcement officer and attempted to convince G. Tay to allow him to conduct a "welfare check" to make sure he was okay. G. Tay said via e-mail: "I am okay for now." G. Tay's final response stated: "Christopher, I appreciate what you're doing. I know my wife is worried. If I were to have a welfare check right now, I would fail. I don't really want to be found. Sorry."

On 4/20/2017 at approximately 1030 hrs., HCSO learned G. Tay was back at his residence. HCSO evaluated G. Tay and he was ultimately Baker Acted.

Detective D. Dao #304, and Detective J. Leggett #300, both with LPD completed the forensic examination acquisition, and analysis of G. Tay's computer in this case.

On 05/22/2017, I met with LPD Forensic Computer Examiners to go over the content found on G. Tay's computer.

I was able to view hundreds of images on G. Tay's computer and identified images of child pornography, which means per [Florida Statutes] 775.0847, [ ] any image depicting a minor engaged in sexual conduct. On the computer were eighty-two porn sites, 473,912 photos, and 1,586 videos. I did not view all sites, photos, or videos. I specifically identified at least one hundred images of child pornography. Some of the images are children being sexually battered by adults to include at least one image of one child under the age of five years old. I observed that every file that was viewed had the initial ".gtay" attached.

Based on the photos that I viewed, and that this company computer was assigned to George Tay, and the fact that the computer is password protected and each image had the initials "gtay" attached, probable cause exists to charge George Tay

with [one hundred counts of] possession of child pornography [Florida Statutes] 775.0847(2)(b)(1)(3) (felony in the second degree).

## STANDARDS OF REVIEW

**AEDPA**

Because Tay filed his federal petition after the enactment of the Antiterrorism and Effective Death Penalty Act, AEDPA governs his claims. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). AEDPA amended 28 U.S.C. § 2254(d) to require:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law or if the state court decides a case differently than [the U.S. Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the U.S. Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529

U.S. at 413. Clearly established federal law refers to the holding of an opinion by the U.S. Supreme Court at the time of the relevant state court decision. *Williams*, 529 U.S. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). A federal petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

**Ineffective Assistance of Counsel**

Tay asserts ineffective assistance of counsel — a difficult claim to sustain. "'[T]he two-part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel.'" *Lafler v. Cooper*, 566 U.S. 156, 162–63 (2012) (quoting *Hill v. Lockhart*, 474 U.S. 52, 58 (1985)). *Strickland v. Washington*, 466 U.S. 668, 687 (1984), explains:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"There is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court

deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To demonstrate prejudice, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690–91. A defendant cannot meet his burden by showing that the avenue chosen by counsel was unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992).

Because the standards under *Strickland* and AEDPA are both highly deferential, "when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. "Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'" *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) (citation omitted).

In a decision without a written opinion, the state appellate court affirmed the order denying Tay post-conviction relief. (Doc. 8-2 at 884) A federal court "'look[s] through' the unexplained decision to the last related state-court decision that does provide a relevant

rationale [and] presume[s] that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). Because the post-conviction court provided reasons for denying Tay's claims in a written order (Doc. 8-2 at 836–40), this Court evaluates those reasons under Section 2254(d).

**Exhaustion and Procedural Default**

A petitioner must exhaust the remedies available in state court before a federal court can grant relief on habeas. 28 U.S.C. § 2254(b)(1)(A). The petitioner must (1) alert the state court to the federal nature of his claim and (2) give the state court one full opportunity to resolve the federal claim by invoking one complete round of the state's established appellate review process. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Picard v. Connor*, 404 U.S. 270, 278 (1971). The state court must have the first opportunity to review and correct any alleged violation of a federal right. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

A federal court may stay — or dismiss without prejudice — a habeas case to allow a petitioner to return to state court to exhaust a claim. *Rhines v. Weber*, 544 U.S. 269 (2005); *Rose v. Lundy*, 455 U.S. 509 (1982). If the state court would deny the claim on a state procedural ground, the federal court dismisses the claim as procedurally defaulted. *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)).

To excuse a procedural default on federal habeas, a petitioner must demonstrate either (1) cause for the default and actual prejudice from the alleged violation of federal law or (2) a miscarriage of justice. *Maples v. Thomas*, 565 U.S. 266, 280 (2012); *House v. Bell*, 547 U.S. 518, 536–37 (2006).

## ANALYSIS

**Ground One**

Tay asserts that trial counsel deficiently performed by failing to advise him that the trial judge would impose a fine of $30,200.00 if he pleaded guilty. (Doc. 1 at 4–10) The post-conviction court denied the claim as follows (Doc. 8-2 at 839):

> Defendant contends trial counsel was ineffective for failing to inform Defendant of the automatic fines associated with the plea. Trial counsel need only advise a defendant of direct consequences of a plea. *See Wilson v. State*, 868 So. 2d 654 (Fla. 2d DCA 2004). Counsel is not required to inform Defendant of fines associated with his plea because they are collateral consequences. Thus, failure to do so cannot substantiate an ineffective assistance of counsel claim. Accordingly, Defendant's claim [ ] is denied.

"[A] plea is more than an admission of past conduct; it is the defendant's consent that judgment of conviction may be entered without a trial — a waiver of his right to trial before a jury or a judge." *Brady v. United States*, 397 U.S. 742, 748 (1970). "Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady*, 397 U.S. at 748.

The information charged Tay with one hundred counts of possessing child pornography, in violation of Sections 775.0847(2) and 827.071(5), Florida Statutes (2017), a second-degree felony. (Doc. 8-2 at 10–49) Each count was punishable by fifteen years in prison and a fine of ten thousand dollars. §§ 775.082(3)(d) and 775.083(1)(b), Fla. Stat. (2017). Under Florida law, "[a] person who has been convicted of an offense other than a

capital felony may be sentenced to pay a fine in addition to any [term in prison]." § 775.083(1), Fla. Stat. (2017).

Because payment of a fine, like a prison sentence, is a direct consequence of a plea, the post-conviction court unreasonably applied *Brady* by determining that "[c]ounsel is not required to inform [a] [d]efendant of fines associated with his plea because [fines] are collateral consequences." (Doc. 8-2 at 839) 28 U.S.C. § 2254(d)(1). *Brady*, 397 U.S. at 748. Fla. R. Crim. P. 3.172(c)(1) ("[T]he trial judge must, when determining voluntariness [of a plea], place the defendant under oath, address the defendant personally, and determine on the record that he or she understands: The nature of the charge to which the plea is offered, the maximum possible penalty, and any mandatory minimum penalty provided by law."). *Morganti v. State*, 573 So. 2d 820, 821 (Fla. 1991) ("A lawful sentence may comprise several penalties, such as incarceration, probation, and a fine.").

Because the post-conviction court unreasonably applied clearly established federal law, this Court must review the claim *de novo*. *Madison v. Comm'r, Ala. Dep't Corrs.*, 677 F.3d 1333, 1335–36 (11th Cir. 2012).

However, even under *de novo* review, the claim is meritless. At sentencing, the trial judge did not impose a fine of $30,200.00 and instead imposed a fine of $500.00 for only one conviction. (Doc. 8-2 at 676) The trial judge permitted Tay to pay the fine and other costs during the term of his probation. (Doc. 8-2 at 676) A judicially noticed docket from state court shows that Tay owes $2,755.00 for the fine, court costs, and the cost of investigation. Case Detail — Financial, Polk County Clerk of Courts, *available at* https://pro.polkcountyclerk.net/PRO/PublicSearch/PublicSearch. (Doc. 8-2 at 685)

Also, before Tay pleaded guilty, the trial judge informed Tay that he faced a fine of

$10,000.00 for each count (Doc. 8-2 at 458–59):

| | |
|---|---|
| [Trial judge:] | In this case, you have been accused of one hundred counts of possession of child pornography as an enhanced offense. Each of those counts is individually punishable by up to fifteen years in prison and a $10,000.00 fine. Do you understand each of the charges and the maximum penalty for each? |
| [Tay:] | Yes. Yes, sir. |
| [Trial judge:] | Your lawyer tells me that you wish to enter an open plea to the Court which means a plea as charged — It is to all counts, correct? |
| [Trial counsel:] | Yes, Your Honor. |
| [Trial judge:] | — without any agreement with the State as to how you would be sentenced, is that correct? |
| [Tay:] | Yes, sir. |
| [Trial judge:] | Do you understand that I could legally sentence you to fifteen years in prison on each count to run consecutive to the other? |
| [Tay:] | Yes, sir. |
| [Trial judge:] | All right. Which would be well beyond anyone's life expectancy, you understand that? |
| [Tay:] | Yes, sir. |
| [Trial judge:] | And you understand as your lawyer said that the sentencing guidelines scoresheet proposed by the State in this case indicates a lowest permissible sentence of life in prison? |

| [Tay:] | Yes, sir. |
|---|---|
| [Trial judge:] | You understand that? |
| [Tay:] | Yes, sir. |
| [Trial judge:] | I'm not saying I will sentence you to life in prison or to what the scoresheet reflects as the minimum, but you need to know that I can do that and I can sentence you to consecutive maximum time on each count, you understand that? |
| [Tay:] | Yes, sir. |
| [Trial judge:] | As well, as the maximum fine on each count, you understand that as well? |
| [Tay:] | Yes. |
| [Trial judge:] | Is this what you want to do is enter an open plea without any agreement with the State as to how you would be sentenced? |
| [Tay:] | Yes, sir. |

"[T]he representations of the defendant, his lawyer, and the prosecutor at [a plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings." *Blackledge v. Allison*, 431 U.S. 63, 73–74 (1977). "Solemn declarations in open court carry a strong presumption of verity." *Blackledge*, 431 U.S. at 74.

Even if trial counsel failed to advise Tay of the maximum fine that he faced if he pleaded guilty, the trial judge's thorough plea colloquy refutes Tay's claim that he did not know the maximum fine. Tay signed a plea form that advised Tay that he pleaded guilty to one hundred counts and faced a discretionary fine of $10,000.00 for each count. (Doc. 8-2 at 443–45, 448) The trial judge asked Tay if he had any questions about the consequences

of the guilty plea, and Tay replied that he did not. (Doc. 8-2 at 462) After the trial judge informed Tay that he faced a fine of $10,000.00 for each count, Tay pleaded guilty. (Doc. 8-2 at 462)

Also, Tay contends that trial counsel failed to inform him that the trial judge would impose costs authorized by Sections 983.05 and 983.10(1), Florida Statutes. (Doc. 1 at 5) The plea form advised Tay that the trial judge could require him to pay $225.00 for the Criminal Justice Trust Fund authorized by Section 983.05, and $151.00 for the Child Advocacy Trust Fund authorized by Section 983.10(1). (Doc. 8-2 at 448–49)

The trial judge's colloquy and the plea form cured any alleged deficiency in trial counsel's performance, and Tay cannot demonstrate prejudice under *Strickland*. *United States v. Medlock*, 12 F.3d 185, 187 (11th Cir. 1994) (citing *United States v. Gonzalez-Mercado*, 808 F.2d 796, 799–800 (11th Cir. 1987)). Consequently, the claim is refuted by the record and meritless.

Ground One is **DENIED**.

**Ground Two**

Tay asserts that trial counsel deficiently performed by failing to share with him two articles that established a correlation between autism and viewing child pornography. (Doc. 1 at 10–17) Tay contends that he would have pursued an insanity defense at trial if trial counsel had shared the articles with him before his guilty plea. (Doc. 1 at 14–16) The post-conviction court denied the claim as follows (Doc. 8-2 at 837–39) (state court record citations omitted):

> Defendant contends trial counsel was ineffective for withholding evidence from Defendant. Specifically, Defendant contends trial counsel withheld two documents discussing the effects of Asperger's Syndrome. Defendant states the

13

documents strengthen his defense of involuntary intoxication. Defendant argues, if he would have reviewed the documents, he would have proceeded to trial. When determining whether a reasonable probability exist[s] that a defendant would have insisted on going to trial, a court should consider the totality of the circumstances surrounding the plea, including whether a particular defense was likely to succeed at trial, the colloquy between the defendant and the court at the time of the plea, and the difference between the sentence imposed under the plea and the maximum possible sentence the defendant faced at trial. *Grosvenor v. State*, 874 So. 2d 1176, 1181–82 (Fla. 2004).

Here, under the circumstances, Defendant's defense was unlikely to succeed at trial and the addition of the information contained in the documents Defendant failed to review would not have changed that likelihood of success. During Defendant's plea hearing, Dr. Henley testified that Defendant had major depressive disorder and displayed characteristics of Autism Spectrum Disorder. After conceding that research cannot make a causal connection between having Autism Spectrum Disorder and being predisposed to viewing child pornography, the State asked Dr. Henley if there are similarities in characteristics between someone with Autism Spectrum Disorder and someone who views child pornography. Dr. Henley responded that there is literature that shows how some of the characteristics in people with Autism Spectrum Disorder correlate with individuals that view child pornography.

Dr. Buffington testified Defendant's medical history included chronic pain, insomnia, diabetes, hypercholesterolemia, and depression. Dr. Buffington testified to Defendant being prescribed Ambien to treat Defendant's insomnia as well as its adverse side effects both alone and in the presence of other medications. Dr. Buffington determined Defendant experienced the side effects of Ambien. However, Dr. Buffington indicated he could not testify that Ambien was causing Defendant to view the child pornography, nor could he testify that Defendant was under any sort of influence each and every time Defendant viewed the illicit material.

Defendant was not prejudiced by his inability to review the document[s]. Trial counsel used at least one of the documents as an exhibit for purposes of mitigation during Defendant's open plea. If Defendant went to trial, his defense would have been involuntary intoxication due to side effects of prescription medications combined with undiagnosed psychological

conditions which resulted in Defendant's inability to form the intent required to commit the alleged offense. Any questioning of trial counsel's decision to use the documents for mitigation as opposed to a defense at this point is indicative of hindsight, which is forbidden by *Strickland*. *See* 466 U.S. at 689 (explaining that in reviewing claims of deficient performance, the post-conviction court must evaluate the case while eliminating the distorting effect of hindsight from the process).

Further, the decision to enter a plea was solely up to Defendant. Defendant knew he and trial counsel developed the defense of involuntary intoxication; yet, Defendant still elected to enter an open plea. Defendant knew he could be sentenced up to fifteen years on each of the one hundred counts charged against Defendant which was well beyond Defendant's life expectancy. Defendant also understood that he did not have to enter a plea and that he could have proceeded to trial. Lastly, Defendant knew that by entering a plea he would be giving up the right to trial, any factual or legal defenses, and the right to appeal the issue of his guilt. With that knowledge, Defendant pleaded guilty and confirmed with the [the judge] that he was pleading guilty because he was, in fact, guilty.

Defendant has not shown deficiency or prejudice. Accordingly, Defendant's claim [ ] is denied.

In his post-conviction motion, Tay alleged that, at the time of the offenses, he ingested Ambien and other medication prescribed by a doctor that disturbed his mental clarity and caused "sexual side effects." (Doc. 8-2 at 722–23) He alleged that he suffered from Asperger's Syndrome and major depressive disorder and contended that the medication and his mental illness "made [him] unable to question his activities to view and download pornography and child erotica, which may have included images of child pornography." (Doc. 8-2 at 722–24)

Tay further alleged that trial counsel withheld documents that supported a defense of "not guilty by reason of involuntary intoxication." (Doc. 8-2 at 722) He contended that the withheld documents supported the defense as follows (Doc. 8-2 at 724–26):

Among the documents withheld by [trial counsel] from [Tay] included two documents on the effects of Asperger's Syndrome. [Trial] counsel['s] [argument] focused on the tendency of those with Asperger's syndrome to engage in unconscious and compulsive collecting behavior. While true, these documents add more to the Defendant's case than collecting behavior alone. In one of these documents, Anat Rubin explains why someone with Asperger's Syndrome, influenced by psychoactive medications with sexual side effects, would likely turn to the internet as an outlet[:] "People on the high functioning end [of the autism spectrum] have impressive cognitive abilities that may mask areas of extreme defect. They may be intellectually adult but socially childlike, hobbled by their inability to understand nonverbal communication . . . and so, a great number of people with high functioning autism take refuge in computers which allow them a way of approaching the world without the discomfort and risk of face-to-face interaction. And they transfer to the computer the same naivete, the same lack of street smarts and common sense, that they have in everyday life, says [autism researcher] Ami Klin." (Downloading a Nightmare: When Autism, Child Pornography, and the Courts Collide, Anat Rubin, May 31, 2017)

Mahoney continues this analysis in his article[:] "Exploration of the online world of pornography inevitably leads some AS individuals to exposure to child pornography. Where the line between pornography and child pornography demarcates a transgression against social norms and criminal law for the non-Asperger individual, for the AS individual, the demarcation is blurred and they are completely unaware that they have crossed a moral and legal line." (Asperger's Syndrome and Criminal Law: The Special Case of Child Pornography, Mark Mahoney, 2009, p. 39)

The documentation echoed the reason [Tay] reported to his psychologist for gravitation to child images from adult pornography. Dr. Henry testified that [Tay] found adult pornography "too vulgar" compared to the simple innocence of the child images. The cited literature stated[:] "Indeed, AS individuals may prescribe the sexually explicit materials as repulsive." (Mahoney, 2009)

Most importantly, both documents state that individuals on the high end of the autism spectrum lack the intent needed to commit these crimes[:] "In prosecuting AS individuals for the

possession of child pornography, the government is wasting precious time and money on offenders who lack the malicious intent presumed in the downloading of child pornography." (Mahoney, 2009) Also, "the results for Defendants can be the crushing impact of a system that clinicians say confuse autistic behavior with criminal intent and assumes, without hard evidence, that looking at images could be the precursor to illicit and dangerous contact with kids." (Rubin, 2017)

Ultimately Mahoney concludes[:] "This unique diagnosis calls upon prosecution and courts to draw distinctions between dangerous and non-dangerous offenders and between those who may access offending depictions because they need to as opposed [to] those who simply do not know better. Generally, the AS individual should not be charged at all. It is totally unnecessary." (Mahoney, 2009)

"[I]n order to satisfy the 'prejudice' requirement [under *Strickland*], the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. "[W]here the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." *Hill*, 474 U.S. at 59. "[T]hese predictions of the outcome at a possible trial, where necessary, should be made objectively, without regard for the 'idiosyncrasies of the particular decisionmaker.'" *Hill*, 474 U.S. at 59–60 (quoting *Strickland*, 466 U.S. at 695).

Whether an insanity defense would have succeeded at trial is an issue of state law, and a state court's determination of state law receives deference in federal court. *Pinkney v. Sec'y, Dep't Corrs.*, 876 F.3d 1290, 1295 (11th Cir. 2017) ("[A]lthough 'the issue of ineffective assistance — even when based on the failure of counsel to raise a state law claim — is one of constitutional dimension,' we 'must defer to the state's construction of its own law' when the validity of the claim that [ ] counsel failed to raise turns on state law.") (citation omitted).

After Tay pleaded guilty, trial counsel presented testimony by a forensic psychologist and a clinical pharmacologist to support a request for a downward departure. (Doc. 8-2 at 554–623) The psychologist opined that Tay suffered from major depressive disorder (Doc. 8-2 at 558) and described a correlation between major depressive disorder and Tay's excessive use of the internet as follows (Doc. 8-2 at 563–64):

| [Trial counsel:] | Do you find any correlation at all between major depressive disorder, specifically Mr. Tay's major depressive disorder and excessive internet use or excessive internet searching? |
|---|---|
| [Psychologist:] | In Mr. [ ] Tay's particular situation, he indicated usage of the internet was an escape for him. And many times, when someone has a mental health condition, they're looking for ways to feel good to escape their problems or kind of have an alternate reality of fantasy and that seemed to be the case with Mr. Tay. |

Also, the psychologist testified that Tay behaved consistently with a person who is diagnosed with autism (Doc. 8-2 at 569–72):

| [Trial counsel:] | Before we specifically talk about Mr. Tay's occupation and education, what are some of the characteristics that Mr. Tay[ ] displayed of autism spectrum disorder? |
|---|---|
| [Psychologist:] | So, I got this information not only by my interview with Mr. Tay, he took a psychological test specific to autism in adults and I also did collateral interviews with his wife and his mother. And from all of that information, Mr. Tay has never related easily with other people, he's always been described as socially awkward the way that he feels and the way that his mother and his wife perceived him. He had what we might call quirks or odd characteristics when he was younger. |

His mother described a situation where he memorized how many stairs were in their house. He had — they had a claim tag to pick up something, like [ ] a dry-cleaning tag, his mother had lost it and he had memorized the number that had many digits to it. He collected things like stamps, novels, matchbox cars, and so he had always had some type of preoccupation or fixated interest which is consistent with autism spectrum.

When I did my interview with him, he also described having sensory integration issues and that means that he's very sensitive to certain food textures. He avoids specific foods because of the texture. He's bothered by high-pitched sounds. He's bothered by seeing bright colors. So, in multiple sensory domains, he's uncomfortable or has issues, which is also a hallmark characteristic in autism.

. . .

[Trial counsel:]   We talked about collecting, that is a characteristic of autism spectrum disorder and also a characteristic that Mr. Tay has displayed his whole life, correct?

[Psychologist:]   Yes.

[Trial counsel:]   What about obsessions or repetitive behaviors or compulsions, any of those classify as characteristics?

[Psychologist:]   Yes.

The psychologist described a correlation between autism and viewing child pornography on the internet (Doc. 8-2 at 572–75):

[Trial counsel:]   Let me kind of just give you a — I understand that the research cannot make a causal connection between being on the spectrum and therefore — therefore

|  | having a predisposition to downloading child pornography, so I understand — I'm prefacing my question by saying I'm understanding that, I'm not going to ask you to do that. |
|---|---|
| [Psychologist:] | Okay. |
| [Trial counsel:] | But do you see a similarity in characteristics between someone who is on the spectrum and someone who is a child pornography viewer? |
| [Psychologist:] | So, in preparation or involvement with this case, I've done a lot of review of the literature looking for that exact topic to see what is the overlap, is there any relationship in this case and there is quite a bit of literature that shows how some of the characteristics in autism spectrum does correlate with individuals [who] view child pornography. |
|  | . . . |
| [Trial counsel:] | Someone who has autism spectrum disorder, let's take it step by step, might find refuge in a computer, is that fair? |
| [Psychologist:] | Definitely. |
| [Trial counsel:] | Because someone with autism spectrum disorder, you testified, has social, you know, social awkwardness, correct? |
| [Psychologist:] | Correct. So, people might be — computers may be easier to understand than [an] interpersonal relationship. |
| [Trial counsel:] | Computers are predictable? |
| [Psychologist:] | Correct. |
| [Trial counsel:] | Okay. And then someone who has autism spectrum disorder might have unusual interests, correct? |

| | |
|---|---|
| [Psychologist:] | Yes. |
| [Trial counsel:] | They might collect things, correct? |
| [Psychologist:] | Correct. |
| [Trial counsel:] | Those collections could come in the form of massive downloads, correct? |
| [Psychologist:] | Could. Yes. |

. . .

| | |
|---|---|
| [Trial counsel:] | Tell me if you agree with this statement: Someone with autism spectrum disorder is smart enough to know that child pornography is illegal but it's not something that they consider at the time of watching it, the legality of it. Would you agree with that, or no? |
| [Psychologist:] | I don't think that can be said in all cases for all people, but I could see in certain situations how that could apply, the lack of social savviness. |
| [Trial counsel:] | Did you have a conversation with Mr. Tay about whether or not he knew it was illegal or whether or not it was something that he even thought about? |
| [Psychologist:] | I did. |
| [Trial counsel:] | And — and what was that conversation? |
| [Psychologist:] | He indicated he never gave that thought. |
| [Trial counsel:] | Does he get it now? |
| [Psychologist:] | Now he gets it. |

A clinical pharmacologist testified that, at the time of the crimes, Tay suffered from chronic pain, chronic insomnia, Type II diabetes, hypercholesterolemia, and depression.

(Doc. 8-2 at 589–90) He testified that Tay took Ambien for his chronic insomnia, a statin for his high cholesterol, a glucose metabolism medicine for his Type II diabetes, and testosterone. (Doc. 8-2 at 593–94, 611–12) Also, a doctor periodically prescribed Tay benzodiazepine or an opiate for his chronic pain. (Doc. 8-2 at 595–96, 608–09)

The pharmacologist testified that a person who takes Ambien may experience as a side effect amnesia or walking, talking, eating, driving, or engaging in sex while sleeping. (Doc. 8-2 at 594–95, 598–603) The pharmacologist testified that a person who suffers from Type II diabetes, depression, and chronic pain and who takes benzodiazepines, opiates, and testosterone may experience more severe side effects from Ambien. (Doc. 8-2 at 594–97, 602, 604–05, 606–08, 610–16)

Tay reported to the pharmacologist that he suffered side effects from Ambien as follows (Doc. 8-2 at 605):

> [Trial counsel:] With all of that in mind, let's now talk specific to Mr. Tay. Was Mr. Tay, in your opinion, experiencing the side effects consistent with Ambien, all the things that we just talked about?
>
> [Pharmacologist:] Yes. Based on what he described in terms of the progressive tolerance to the medication, based on sleep eating and sleep work behaviors that he was not aware of, but his family was telling him that he was experiencing — that he would fall asleep the next day.
>
> We — we read in section five of the package insert, we saw central nervous system, depression, and next-day impairment, the next-day impairment is the equivalent of a fog, a mental or cognitive fog that takes place into the next day that's a result of the impaired sleep.

| | |
|---|---|
| [Trial counsel:] | Did you learn from Mr. Tay that he was experiencing fog at work, fatigue at work, confusion at work, sleeping at work? |
| [Pharmacologist:] | Both, at home and at work. |
| [Trial counsel:] | Did he talk about ever having a come to or being startled with awareness — |
| [Pharmacologist:] | Yes. |
| [Trial counsel:] | — by anyone? |
| [Pharmacologist:] | He mentioned that there were times the next day he would go onto his computer and find evidence of websites being opened or materials being present on his computer. |

Tay further reported experiencing "mental cloudiness" and "confusion." (Doc. 8-2 at 612)

The pharmacologist concluded that the Ambien substantially impaired Tay's ability to appreciate the criminal nature of his conduct as follows (Doc. 8-2 at 616–17):

| | |
|---|---|
| [Trial counsel:] | Did you ultimately come to a conclusion in this case? |
| [Pharmacologist:] | I did. |
| [Trial counsel:] | And [ ] what was your professional opinion concerning the symptoms and the side effects that George Tay was experiencing around the time in question when he was looking at this pornography? |
| [Pharmacologist:] | That they could and would directly impact his ability — his cognitive function during those times. |
| [Trial counsel:] | Okay. And is it your professional opinion that George Tay suffered from impaired judgment, reasoning, and memory as a result of his medical conditions and side effects to prescribed medications? |

[Pharmacologist:]    Yes. Based on the totality of his presentation.

[Trial counsel:]    And is it your professional opinion that the capacity of Mr. Tay's ability to appreciate the criminal nature of his conduct and to conform that conduct to the requirements of the law was substantially impaired?

[Pharmacologist:]    Yes. Based on hallucinations, parasomnias, and the other factors, that's absolutely correct.

[Trial counsel:]    And you talked about a perfect storm before, we're talking about his depression, his medication, and — and the side effects in general that all these — that these medications caused in conjunction with taking them together, correct?

[Pharmacologist:]    Correct. And not just one in each of those categories but multiples.

On cross-examination, the pharmacologist admitted that he could not opine that Ambien caused Tay to view child pornography (Doc. 8-2 at 620–21):

[Prosecutor:]    You heard the testimony here earlier, this behavior lasted from around October of 2014, all the way up to April of 2017, where every morning he was getting up, [on] work days, and going to work and coming home, just going through that routine. And you heard the number of pictures he downloaded. Are you telling me during that entire period, every time he was doing that over this multiple-year period that Ambien was causing him to do this?

[Pharmacologist:]    No, sir. Nor could I attest to the times. I don't think I heard in today's testimony the frequency or exact number of days or intervals between the days that that took place.

24

| | |
|---|---|
| [Prosecutor:] | Well, let's say working days between, as I said before, October of 2014, and April of 2017, that's easy enough to compute, you know, how many days that is, it's quite a few. |
| [Pharmacologist:] | Oh, it would be many days. |
| [Prosecutor:] | Yes. |
| [Pharmacologist:] | But I never heard any testimony that it was every working day between those dates. |
| [Prosecutor:] | Let's say it's not, I'm just talking about the length of time. |
| [Pharmacologist:] | Yes, sir. |
| [Prosecutor:] | So, you think that because he took Ambien, that all — this whole period of time, looking at various times at this horrible, horrible material and being a father, you think that he didn't realize that was wrong, and it was — he kept repeating that because simply he was on Ambien? |
| [Pharmacologist:] | No, sir. I couldn't opine to that to every moment. What I did opine to is the adverse side effects of these medications which could render someone not aware they're doing it at the time. |

Section 775.027(1), Florida Statutes, establishes an affirmative defense to a criminal prosecution if "at the time of the commission of the acts constituting the offense, the defendant was insane." The statute requires a defendant to demonstrate by clear and convincing evidence that:

(a)    The defendant had a mental infirmity, disease, or defect; and

(b)    Because of this condition, the defendant:

      1.      Did not know what he or she was doing or its consequences; or

      2.      Although the defendant knew what he or she was doing and its consequences, the defendant did not know that what he or she was doing was wrong.

At sentencing, Tay presented evidence that he suffered from autism and took medication that impaired his ability to understand that possessing child pornography was wrong. The articles that Tay contends that trial counsel withheld from him tended to support a theory that Tay did not know that possessing child pornography was wrong because of autism.

However, even if Tay had presented an insanity defense at trial, other evidence would have persuasively rebutted the defense. At sentencing, a detective testified that Tay hid the files that contained child pornography on his laptop (Doc. 8-2 at 487–89):

| [Prosecutor:] | Okay. What measures did this Defendant take to hide these videos? |
|---|---|
| [Detective:] | So, the — the user of the account, I know Mr. Tay's name, it was G. Tay was the name of the account, and that particular user went to such great lengths to actually hide the child pornographic material in locations that were both concealed, meaning actually in hidden locations within the file system — |
| [Prosecutor:] | Let me — let me stop — let me interrupt you here. |
| [Detective:] | Uh-huh. |
| [Prosecutor:] | You said earlier that the company did periodic backups? |
| [Detective:] | Yes, sir. |

[Prosecutor:]        So, why didn't the company see these seven-year-old, *et cetera* —

[Detective:]        Uh-huh.

[Prosecutor:]        — before this date when they contacted you?

[Detective:]        Uh-huh. The — I could assert that it would be reasonable that they were not found prior to it expanding in such a large way that it broke the backup, if you will, process; but I would — I would assert that it's because of the locations where they were stored. It wasn't simply just stored in the, you know, My Documents, My Pictures folder, it was stored in hidden folder locations or — the — the user even went so far to name the folder structure to resemble a type of — and I've got it actually here, if you don't mind I will reflect, a type of "Visual Basic 2005 Power Packs." So, that's actually a legitimate folder.

[Prosecutor:]        That a business of this type would have?

[Detective:]        What — what they did. I actually —

[Prosecutor:]        Yeah.

[Detective:]        — confirmed that forensically. The — the business did have this installed on their machine but it's normally in the hidden applications location on the file system because the program that I just referred to, the Visual Basics 2005 Power Packs, that — so that particular software, when it installs itself it's in a hidden location. But if you're, you know, layman IT person, you're — you're just seeing maybe file names go across the network for the backup and —

[Prosecutor:]        It wouldn't catch your attention?

> [Detective:]     It wouldn't catch your attention because it's common, it's something you see often.

Also, the detective testified that Tay encrypted the files that contained child pornography (Doc. 8-2 at 493–94):

> [Prosecutor:]    Okay. What do you notice about these passwords, how many were there?

> [Detective:]     So, those — so, I did — for clarification, I did find, I did a password search. The reason for that password search was because of the files that were indicative of child pornography were stored in encrypted, some of them were stored in encrypted containers or encrypted — and encrypted compressed files, is the — the most — lowest level of explanation for that. And so that prompted me to look for, if there is encrypted files here there might be passwords. So, I know that in my experience, it's common for people to — somebody irresponsibly, in the sense it's not the most secured thing, but they store their password list with the word "password." It's exactly what I found. I did a search across the whole computer and sure enough two, a Word document and a spreadsheet was found, the title of those documents had [a] password in it and so upon further examination, and to answer your question, this spreadsheet had twenty-one — twenty-one files listed. There was technically twenty-two, the number twenty-two was there but nothing was — was there yet. It was like a running list that was being created almost of, you know, a personal preference list of — of files of — of interest to the user somehow and then there was a number twenty-two where nothing had been written yet.

After the information technology manager discovered child pornography on Tay's laptop and after the vice president gave the laptop to police and placed Tay on administrative leave, Tay left his wife a note apologizing, admitting that he "failed [her] one more time," admitting that he was "so stupid," asking her to tell their children that he loved them, and telling her that "the thought of [her] reading [the letter] [was] paralyzing." (Doc. 8-2 at 6) The same day, Tay paid a deposit on a shotgun at a gun store. (Doc. 8-2 at 7) When Tay's daughter and wife tried to reach Tay by e-mail, he responded but refused to meet with them. (Doc. 8-2 at 7) When a detective asked Tay to meet so that the detective could check on Tay's welfare, Tay refused and responded (Doc. 8-2 at 7): "I appreciate what you're doing. I know my wife is worried. If I were to have a welfare check right now, I would fail. I don't really want to be found. Sorry."

Even if Tay presented an insanity defense, this evidence demonstrated that Tay deliberately hid and encrypted the files that contained the child pornography on his work laptop, immediately expressed remorse after his employer discovered the child pornography, and displayed regret by refusing to meet with his wife, his daughter, or the police officer for a welfare check and by placing a deposit on a shotgun at a gun store. This evidence would have convincingly rebutted Tay's claim that he did not know that possessing child pornography was wrong and that he was not functioning under any delusions when he viewed the child pornography and concealed it through sophisticated measures. Because Tay cannot demonstrate a reasonable probability that the outcome would have changed if trial counsel shared with him the articles and pursued an insanity defense, the post-conviction court did not unreasonably deny the claim. *Strickland*, 466 U.S. at 694. *State v. Van Horn*, 528 So. 2d 529, 530 (Fla. 2d DCA 1988) ("'Expert testimony, even when

uncontradicted, is not conclusive on the issue of sanity and the trier of fact may find such testimony adequately rebutted by the *observations* of laymen.'") (citation omitted and italics in original).

Ground Two is **DENIED**.

**Ground Three**

Tay asserts that trial counsel deficiently performed by stipulating that a factual basis supported his guilty plea. (Doc. 1 at 17–21) He contends that the prosecutor failed to present any evidence that he knowingly possessed the child pornography. (Doc. 1 a 17–21)[1] The post-conviction court denied the claim as follows (Doc. 8-2 at 837) (state court record citations omitted):

> Defendant contends trial counsel was ineffective in failing to challenge the factual basis for the plea. Trial counsel cannot be deemed ineffective for failing to raise a meritless claim. During the plea colloquy, the [judge] stated [he] reviewed the probable cause affidavit which "appear[ed] to provide a factual basis." When the [judge] asked trial counsel if she stipulated to the probable cause affidavit providing a factual basis, trial counsel responded, "I do for purposes of the plea." Defendant's employer found what appeared to be child pornography on Defendant's work computer. Law enforcement was able to view hundreds of images on Defendant's computer and specifically identified at least one hundred images of child pornography. Every file viewed had the initial[s] "gtay" attached. Trial counsel had no legal reason to challenge the factual basis for the plea. Defendant's claim [ ] is denied.

---

[1] In support of Ground Three, Tay submitted a supplemental brief and attached the Lakeland Police Department's response to a public records request that Tay served after he filed the petition in this action. (Doc. 17 at 10–18) Tay contends that the response to the public records request supports the claim in Ground Three. (Doc. 17 at 1–8) However, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Consequently, this Court cannot consider the response when reviewing Tay's claim.

After Tay pleaded guilty, trial counsel stipulated that facts in the arrest affidavit supported the plea. (Doc. 8-2 at 465) In the arrest affidavit, a detective stated that the vice president of BrightVolt gave police Tay's laptop from work. (Doc. 8-2 at 6) A detective forensically examined the laptop and discovered hundreds of files that contained child pornography. (Doc. 8-2 at 7) Each filename contained the letters, "gtay" — the initial of Tay's first name, George, and his last name. (Doc. 8-2 at 6–7) This evidence, which demonstrated that Tay knowingly possessed child pornography, supported the guilty plea. *See Bussell v. State*, 66 So. 3d 1059, 1062 (Fla. 1st DCA 2011) ("'Constructive possession exists where the accused does not have physical possession of the contraband but knows of its presence . . . and can maintain dominion and control over it.' Where contraband is found on premises in joint possession, knowledge of the contraband can be established with actual knowledge or circumstantial evidence from which the jury could infer guilt.").

Also, when Tay pleaded guilty, he acknowledged under oath that he understood that he waived his right to a jury trial and his right to require the prosecutor to prove the crimes beyond a reasonable doubt (Doc. 8-2 at 459–60):

> [Trial judge:]     You do not have to do that; you have the right to have a trial, a jury trial, where it would be up to the State to prove that you're guilty of each of these offenses by evidence beyond and to the exclusion of every reasonable doubt while you are presumed to be innocent and the jury is told you're presumed innocent; do you understand all of that?
>
> [Tay:]     Yes, sir.
>
> [Trial judge:]     At the trial, you would have the right to be represented by your lawyer and with her assistance confront and cross-examine the State's witnesses, compel witnesses to

> appear and give testimony for you, testify yourself if you wish or remain silent and have the jury told they cannot consider your silence or hold it against you in any way in deciding their verdict; do you understand that you would have all of those rights at a trial?

[Tay:]          Yes, sir.

Because the arrest affidavit contained facts that demonstrated that Tay knowingly possessed child pornography and Tay knowingly waived his right to a trial, the record refuted the ineffective assistance of counsel claim. Consequently, the post-conviction court did not unreasonably deny the claim. *Blackledge*, 431 U.S. at 73–74.

Ground Three is **DENIED**.

Accordingly, Tay's petition (Doc. 1) for a writ of habeas corpus is **DENIED**. The Clerk is **DIRECTED** to enter a judgment against Tay and **CLOSE** this case.

## DENIAL OF CERTIFICATE OF APPEALABILITY AND LEAVE TO PROCEED *IN FORMA PAUPERIS*

Because Tay neither makes a substantial showing of the denial of a constitutional right nor demonstrates that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues that he seeks to raise, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2). *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

**DONE AND ORDERED** in Tampa, Florida on November 27, 2024.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

32